### UNITED STATES v. SOUTHERN PAC. CO. et al.

#### (District Court, D. Utah. March 9, 1917.)

#### No. 3575 (420).

1. MONOPOLIES ⊜⇒16(1)—ANTI-TRUST ACT—EXISTING RELATIONS—NEW LEASE.

Where the relation of lessor and lessee between two railroad corporations, whose lines had been originally constructed as part of the same general system and continuously operated under one management, was reversed in 1885 by the surrender of the leases and a lease of the lines belonging to the former lessee to the former lessor, and that lease was superseded by a new lease in 1893 for the balance of the term of the lease of 1885, the new lease making only immaterial changes in the former lease, neither of those transactions affected the exemption from the operation of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209, of the proprietary relations existing prior to the passage of that act

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12.]

2. MONOPOLIES ⊜⇒16(1)—ANTI-TRUST ACT—EFFECT OF STATE STATUTE.

That a lease of railroad lines was not authorized by state statutes does not render it subject to the Anti-Trust Act, since that act deals with actual conditions affecting interstate commerce, whether they are authorized by state statute or not.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12.]

3. MONOPOLIES ⊜⇒16(1)—ANTI-TRUST ACT—EXISTING RELATIONS—NATURALLY COMPETING COMPANIES.

Where there had been since 1870 a continuous common control of the railroads owned by two corporations, effected by leases and unquestioned by the state, so that there never had been from the time of their construction any existing competition between them, and the lessee in 1899 purchased the stock of the lessor company, the Anti-Trust Act does not apply, though two of the lines would be competing if the relationship were dissolved, since that act was not intended to create competition that had never before existed by destroying a proprietary relationship existing at the time of its passage.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12.]

4. STATUTES ⊜⇒219—CONSTRUCTION—EXECUTIVE CONSTRUCTION—COMMISSION APPOINTED BY CONGRESS.

The settlement of the indebtedness of the Central Pacific Railroad Company to the United States, arranged by a commission consisting of the Secretary of the Treasury, the Secretary of the Interior, and the Attorney General, appointed by Congress to arrange such a settlement after Congress had knowledge that the lines of the Central Pacific Company had been leased to the Southern Pacific Company, in which settlement the interest of the lessee had been recognized by requiring it to guarantee the bonds given to secure the settlement notes, and which settlement had been approved by the President, is entitled to more weight than the administra-

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tive construction of a statute by ordinary public officers subject to legislative restraint, as a construction of the Anti-Trust Act as not applying to the relation between the roads.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 296, 297.]

5. RAILROADS ⊙⇒131—INCORPORATION—STATUTE—LEASE AND SALE OF STOCK.
The Pacific Railroad Acts (Act July 1, 1862, c. 120, 12 Stat. 489; Act July 2, 1864, c. 216, 13 Stat. 356; Act June 20, 1874, c. 331, 18 Stat. 111), requiring the Central Pacific Railroad to maintain physical connection with the Union Pacific, to make a through line and to furnish equal advantages and facilities as to rates, time, and transportation, were not violated by the lease of the lines of the Central Pacific to the Southern Pacific, and the subsequent purchase by the latter of the stock of the former, so long as the statutory requirements were observed.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 404–406.]

Carland, Circuit Judge, dissenting.

In Equity. Suit by the United States against the Southern Pacific Company and others to enjoin and dissolve an alleged monopoly and combination in restraint of trade and commerce. Petition dismissed.

E. F. McClennen, Sp. Asst. Atty. Gen., of Boston, Mass., and James W. Orr, Sp. Asst. Atty. Gen., of Atchison, Kan. (The Attorney General, C. Carroll Todd, Asst. Atty. Gen., and Edward E. Gann, Sp. Asst. Atty. Gen., on the briefs), for the United States.

Garret W. McEnerney and Peter F. Dunne, both of San Francisco, Cal. (J. P. Blair, of New York City, and Wm. F. Herrin, of San Francisco, Cal., on the briefs), for defendants.

Perry D. Trafford, of New York City, for Union Trust Co. of New York.

Before SANBORN, HOOK, and CARLAND, Circuit Judges.

HOOK, Circuit Judge. This is a suit by the United States to enjoin and dissolve an alleged monopoly and combination in restraint of trade and commerce, formed by a lease to the Southern Pacific Company until January 1, 1984, of the railroads of the Central Pacific Railway Company, and by the acquisition by the former company of all the stock of the latter, in violation of the Sherman Anti-Trust Act of July 2, 1890. It is also charged that the control so obtained by the Southern Pacific Company is contrary to the Pacific Railroad Acts of July 1, 1862 (12 Stat. 489, c. 120), July 2, 1864 (13 Stat. 356, c. 216), and June 20, 1874 (18 Stat. 111, c. 331).

The needs of the case do not require a history in detail of the origin and growth of the various railroads which the government regards as composing two independent systems that should be kept separate and competitive. It will be sufficient to refer generally to the two companies and their respective constituents and predecessors, inclusively, as the Southern Pacific and the Central Pacific, and to speak more precisely only when necessary. We may say in the beginning that the location and physical interdependence of the lines of these companies in California and Oregon give the distinct appearance of a single system of railroads. So clearly is this so of the lines in California and

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Oregon north of Sacramento that when an attempt was made in 1913, in the matter of the dissolution of the combination of the Union Pacific and Southern Pacific, also to divorce the Central Pacific from the Southern Pacific, it was generally agreed they should be left with the latter company. It is equally clear as regards the Central Pacific and Southern Pacific lines in California south from Sacramento and San Francisco. Those of the Central Pacific appear on the map as natural links and parts of the Southern Pacific system. Practically all of the spurs, branches, and tributary feeders of the Central Pacific lines are the property of the Southern Pacific.

It is only when we consider the Central Pacific line from San Francisco to Ogden, Utah, on the one hand, and the Southern Pacific main line from San Francisco, through Yuma and El Paso, to New Orleans, on the other, that the propriety of their common control seems in any degree debatable. This aspect of the railroad map is confirmed in great measure by the history of the construction of the various roads. The Central Pacific Railroad Company of California, the ancestor of the present Central Pacific, was incorporated in 1861. Up to 1870 it had constructed or acquired and put in operation the lines from San Francisco to Ogden, from Niles to San Jose, in California, and from Roseville to Chico, in the same state. The Southern Pacific Railroad Company was incorporated in 1865, and in 1870 the construction of the Southern Pacific lines was actively commenced. There was not much of importance of the Southern Pacific before that year. In 1870 and prior thereto the Central Pacific was dominated and controlled by Leland Stanford, Charles Crocker, C. P. Huntington, and Mark Hopkins, and in that year, if not earlier, the same group of men were in control of the Southern Pacific. For at least 15 years thereafter, and during the most important constructive period of the Southern Pacific, a common control and dominance over both companies was exercised by them or the representatives of their estates. Parts of the lines of both companies were built by the same construction companies owned by Mr. Stanford and his associates, under the same superintendence, and with the same equipment. The primary financing of the enterprises was done by them. The Central Pacific was employed as the principal or parent company and the Southern Pacific as its subsidiary, or rather as the corporate instrumentality for the expansion of its system. Except as to corporate title and bookkeeping, there were generally the aspects of a single enterprise. In this respect the conditions were not unlike those which have characterized the growth of many of the important railroad systems of the country in which, for necessity or convenience of financing and in some instances because of local laws, separate corporate organizations were utilized. Between 1870 and 1883, as fast as the Southern Pacific lines were built from Goshen, Cal., the terminus of the Central Pacific, south to Los Angeles, thence eastward to Yuma, and across Arizona and New Mexico, and into Texas, they were turned over by completed sections to the Central Pacific for operation. Up to 1885 all the Southern Pacific railroads, including the main line to New Orleans (with an unimportant exception), were officially announced, advertised, and operated

by the Central Pacific as part of its system. The legal relation between the two companies was expressed in executed leases, and the system was known as "Central Pacific Railroad and Leased Lines."

[1] In February, 1885, the Southern Pacific having become the major factor, the relation was reversed, and the Central Pacific leased all its railroads to the Southern Pacific (Company of Kentucky) for 99 years from April 1, 1885. The old leases of the Southern Pacific lines to the Central Pacific were 'surrendered by the same instrument. This was five years before the passage of the Anti-Trust Act. In December, 1893, another lease from the Central Pacific to the Southern Pacific was executed, modifying the terms of the lease of 1885 in matters not important here, and though the older instrument was 'canceled in terms, in legal effect the relation of lessor and lessee continued unbroken. The term of this last lease is until January 1, 1984. Whatever immunity or exemption from the operation of the Anti-Trust Act attended the proprietary relations existing prior to its passage was not destroyed by the change in the position of the parties effected by the lease of 1885. Nor did the amendment of that lease in immaterial respects in 1893 create a new starting point. It is not material that the amendment was by a revision substituted for the old instrument instead of by a separate supplement. The applicability of the Anti-Trust Act cannot be made to rest on such considerations.

[2, 3] It is also argued that the leases mentioned were not authorized by the statutes of California. We need not consider that. We do not think the Anti-Trust Act picks up the laws of the states for original enforcement. It deals with actual conditions affecting interstate commerce, whether they are authorized by those laws or not. In the case before us there was from 1870 an existing, continuous, common control of the railroads of both companies created by leases executed and observed by the parties and unquestioned by the state. This was the situation when the Central Pacific debt to the United States was settled in 1899 pursuant to the act of July 7, 1898 (30 Stat. 659, c. 571), and when the Southern Pacific acquired all the stock of the present Central Pacific which was then organized to succeed the old company. In United States v. Union Pacific, 226 U. S. 61, 85, 33 Sup. Ct. 53, 57 (57 L. Ed. 124), the court said:

"We take it, therefore, that it may be regarded as settled, applying the statute as construed in the decisions of this court, that a combination which places railroads engaged in interstate commerce in such relation as to create a single dominating control in one corporation, whereby natural and existing competition in interstate commerce is unduly restricted or suppressed, is within the condemnation of the act."

Prior to the stock acquisition in 1899 and since there never was a time, in our opinion, when there was in any real substantial sense "a natural and existing competition in interstate commerce" between the Southern Pacific and the Central Pacific, within the intent of the Anti-Trust Act. Prior to 1870 the Southern Pacific lines were a negligible factor as a competitor in such commerce, and thereafter the situation has been as we have described. That competition of the kind mentioned might now result from an enforced independence of the two

companies and a separation of their railroads may be true, but we do not think the statute was intended to create competition by destroying a proprietary relation formed long before its passage and by the very means of which a railroad system has been brought into existence.

[4] That the Southern Pacific control of the Central Pacific was not regarded as contrary to the statutes of the United States appears from the proceedings under the act of July 7, 1898 (30 Stat. 659). By that act a commission, consisting of the Secretary of the Treasury, the Secretary of the Interior, and the Attorney General, was appointed to settle the Central Pacific debt to the United States. The act provided that "any and all settlements" should be subject to the approval of the President. William McKinley was then President, and the other officials were Lyman J. Gage, Cornelius N. Bliss, and John W. Griggs. The settlement was effected as of February 1, 1899. At that time the Central Pacific debt to the United States for government aid in the construction of the lines between Sacramento and Ogden, and Sacramento and San Jose, amounted to $58,812,715.48. More than half of this amount was accrued interest, and it was secured by a statutory lien on the two bond-aided lines, subject to prior first mortgages. In addition, the Central Pacific bonded debt then amounted to $57,471,000, most, if not all, of which was secured by first mortgages upon its various lines of road. It had outstanding $67,275,500 of stock. Before stating the details of the settlement, the conditions in the light of which the statute authorizing it was passed may be briefly mentioned. Congress had been fully aware for many years of the relations between the Central Pacific and the Southern Pacific. As early as 1886 the President transmitted to the House of Representatives a copy of the lease of 1885, and from that time on the connection of the two companies was frequently the subject of official and legislative communications and reports. In February, 1890, a copy of the lease was laid before the senate, with the report of a committee in which it was said:

"It is manifest from the terms of their lease that any bill for the adjustment and settlement of the debt of the Central Pacific Company must, in order to be efficacious, contain provisions by which this lease and the obligations of the Southern Pacific Company under it shall become security to the United States, and that the consent of the Southern Pacific Company shall be obtained to such provisions of the bill."

The committee was of the opinion that the existing security of the government on the Central Pacific property was inadequate, and that in case of foreclosure of the first mortgages the property would be substantially exhausted in satisfying them. They reported that among the plans suggested to them was one "that all the associated lines forming the Southern Pacific Company (and these include the Central Pacific as consolidated) become parties" to 2 per cent. bonds of the United States secured by a first lien upon the consolidated properties of all the lines. The above is but a small part of a continuous history of legislative efforts in the years preceding the act appointing the commission. Congress was fully informed of the lease and its terms, and that in any conventional settlement the Southern Pacific could not be

ignored, but had to be reckoned with. Agreement or litigation with the Southern Pacific were unavoidable alternatives, and the remedy by foreclosure of the statutory lien meant probable substantial loss. While the bills introduced in Congress to effect a direct legislative settlement did not pass, it does not appear that the failure was due to a definite opposition of that body to the relation between the two companies. But, however that may be, the whole situation in all its angles and complications was public history, and with definite knowledge of it Congress committed the settlement to the commission. The commission was given "full power to settle the indebtedness  *  *  * upon such terms and in such manner as may be agreed upon by them, or by a majority of them, and the owners of said railroads." The power, however, was subject to the following limitations: The government was to receive not less than the full amount of principal and interest due it, in equal semiannual installments, with interest not less than 3 per cent. per annum, payable semiannually, "with such security as to said commission may seem expedient"; final payment and full discharge not to be postponed beyond 10 years, all to become due upon default in any installment or interest, and if settlement was not perfected the President should proceed at once to foreclose. No other conditions than these were prescribed.

An agreement of settlement as of February 1, 1899, was made and signed by the commissioners, the Central Pacific, and Messrs. Speyer & Co., who were managing the reorganization of that company. It was approved by the President. Contemporaneously with the consummation of the settlement the Central Pacific was reorganized under a plan that provided for a new Central Pacific Company and its issue of $100,000,000 of first refunding 4 per cent. mortgage bonds. The plan also contemplated the guaranty of the bonds by the Southern Pacific and its acquisition of the stock of the new company. There was the same publicity of the details of this plan as generally attends the reorganization of important railroad systems, and the commission was advised of them in the early stages of its preparation. By the agreement of settlement the Central Pacific was to execute to the United States 20 promissory notes, dated February 1, 1899, payable, respectively, on or before the expiration of each successive 6 months for 10 years, each for the sum of $2,940,635.48, or one-twentieth of the total debt, and bearing interest at 3 per cent. per annum, payable semiannually. Each note contained a provision for the maturity of all upon partial default, as provided in the act appointing the commission. The Central Pacific, "or its successor company having title to the aforesaid railroads," was also to make an issue of 45-year 4 per cent. gold bonds, not exceeding $100,000,000 in all, secured by a first refunding mortgage upon all its railroads, whether bond-aided or not, and all its equipment and terminals. The bonds were to be further secured by the guaranty of the Southern Pacific, and were to be, as expressed in the agreement of settlement, "prior in lien to any lease of the railroads of said Central Pacific." Of these bonds $58,-820,000 were to be deposited with the Treasurer of the United States as security for the 20 installment notes. In addition, Speyer & Co.,

reorganization managers, were within one month after the execution and delivery of the notes to purchase from the United States without recourse the 4 earliest maturing and pay therefor the face amount, $11,762,543.12, and accrued interest. A proportionate amount of the collateral mortgage bonds was to go with the 4 notes. The above constituted the security which seemed expedient to the commission within the authority conferred by the act of Congress.

The agreement of settlement was carried out in all its details. The lease to the Southern Pacific was subordinated to the mortgage securing the new first refunding bonds by an indenture executed by that company, which recited as consideration "the benefits and advantages to be derived by said party of the first part (the Southern Pacific) from the carrying out of the agreement between the United States, the Central Pacific Railroad Company, and Messrs. Speyer & Co., dated February 1, 1899." On February 15, 1899, the commission reported to the House of Representatives. The report was in general terms and referred to the agreement of settlement, a copy of which accompanied it. No reference to the guaranty of the Southern Pacific appeared in the report or the agreement, but the proof is convincing that the commission regarded it as a vital feature of a settlement. In the annual report of the Attorney General to the Senate and House of Representatives in November, 1899, the completion of the settlement was set out, but the guaranty of the Southern Pacific was inadvertently stated as being upon the notes, instead of upon the bonds securing them. With the exception of some credits, which will be presently mentioned, the notes held in the treasury of the United States were paid by the checks of the Southern Pacific. That company charged the amounts to the Central Pacific upon their intercompany accounts.

The rule as to the persuasive force of an administrative construction of statutes is a familiar one, and is frequently applied, but in the case before us there was more than the ordinary acts of public officers subject to legislative restraint. Here there was a commission, composed of the very highest officials of the government, specially created and charged with the adjustment of a difficult and complicated business that had for years engaged the attention of Congress. Limitations upon their power and conditions to be observed were expressly set forth in the statute, but none remotely suggesting any obstacle in the Anti-Trust Act. Except as to those limitations and conditions, plenary power was given them. The relations between the Southern Pacific and the Central Pacific, long a matter of public history, naturally foreshadowed the engagement of the former in any adjustment of the financial condition of the latter; and additional considerations then affecting the other transcontinental railroad companies pointed the same way. So natural, if not inevitable, was the settlement that was made that the omission of limitations now urged is most significant. We do not say the commission was authorized to violate or to sanction the violation of the act of Congress, but the adjustment they effected necessarily involved the question of its pertinence to the business in hand. The acceptance of the guaranty of the Southern

Pacific was a recognition that it had sufficient corporate interest in the Central Pacific to justify it. Without such interest its accommodation guaranty of $100,000,000 of bonds of another company would manifestly have been ultra vires—a gross, indefensible excess of its corporate powers. Again, the acceptance of the guaranty implied a recognition of its possible natural result; that is to say, the enforcement of the rights of a guarantor against the property of a debtor. The addition of the stock ownership by the Southern Pacific to its long leasehold interest did not so change the situation as to make unlawful what was not so before.

With knowledge of the settlement, and, it may be fairly presumed, of the details that were public history, Congress authorized the Secretary of the Treasury to dispose of "any notes in his possession touching the indebtedness of the Central Pacific Railroad Company to the United States." Act March 3, 1899, c. 427, 30 Stat. 1245. Further, by Act March 3, 1901, c. 831, 31 Stat. 1023, the Secretary of the Treasury was authorized and directed to settle claims for interest growing out of transportation services for the government "over non bond-aided lines of the Southern Pacific Company and Central Pacific Railroad Company by crediting" the amounts upon the Central Pacific installment notes. This was done. The claims were just debts of the government, and the legislative direction to credit those due the Southern Pacific upon the indebtedness of the Central Pacific was a recognition, in some degree, at least, of a relationship between the two companies that justified it. There was no other warrant or authority than that which arose from the proprietary position of the Southern Pacific.

It is contended by both parties that the opinion and decision of the Supreme Court in United States v. Union Pacific, supra, has a decisive bearing upon the case at bar. Aside from the controlling principles of law announced by the court and a matter presently to be mentioned, we do not think so. The Central Pacific was not a party to that suit, and though the relations between it and the Southern Pacific were mentioned in the opinion the references were not condemnatory, but were explanatory of the railroad situation and the movements of traffic. The court said, however, that nothing in its opinion should be considered as preventing the court below from approving or adopting a plan providing for the retention by the Union Pacific of the Central Pacific line from San Francisco to Ogden. There is a relevance here in the necessary inference that such retention by the Union Pacific would not have been regarded as contrary to the Anti-Trust Act. On the record then before the court it appeared that the Union Pacific already controlled the line from Portland, Or., to Granger, Wyo., and was largely interested in the line from San Pedro, Cal., to Salt Lake City, Utah. The retention by the Union Pacific of the Central Pacific road from San Francisco to Ogden would have given the former company lines from the three important ports—Portland, San Francisco, and San Pedro—to connections with its main line in Utah and Wyoming. In corporate origin each of the three lines was separate and distinct from the others and from the Union Pacific, in the same sense as

the Southern Pacific and Central Pacific are corporately separate. With steamship connections with the Orient, the three lines were theoretically, at least, competitors for foreign traffic destined through those ports eastward to the interior of the United States or to the Atlantic seaboard. But the control of all of them by the Union Pacific was evidently not deemed a suppression of competition sufficiently direct and appreciable to be repugnant to the Anti-Trust Act. The situation considered by the court in that case is not greatly different in its ultimate significance from the case at bar. If the Anti-Trust Act be construed to reach proprietary relations, as distinguished from those of a mere continuous operating character, formed long prior to its passage, whereby divergent or tangential lines of road to widely separated gateways or points in the currents of traffic movement are held in a single ownership or control, its enforcement accordingly would have such a destructive effect upon established, accepted railroad systems of the country that their inclusion within the intent of Congress may well be doubted.

After the decision of the Supreme Court that the combination of the Union Pacific and the Southern Pacific was unlawful, those companies, to meet the suggestions of the Attorney General, incorporated in the plan to dissolve the combination provisions for the surrender by the Southern Pacific to the Union Pacific of all the Central Pacific lines except one from Northern California to the northern state line and a branch therefrom into Oregon. These provisions were in excess of the mandatory requirements of the Supreme Court, and their consummation depended upon the approval of the Railroad Commission of California. Upon a consideration of them the Commission expressed the belief that the arrangement would "not substantially benefit the shippers of transcontinental freight either in rates or in service," and that it would be a distinct detriment to local commerce within the state. However, the Commission made certain modifications and conditions as to features within its jurisdiction; but the railroad companies were unable to agree to them, and that part of the plan was abandoned. The failure to agree was followed by this suit to separate the Southern Pacific and the Central Pacific, but we think the doubts of the California Commission would apply with equal force to the result now sought to be accomplished. It may be observed in this connection that this case of the government, unlike others of similar character, finds little, if any, support in testimony from complaining shippers or the public generally.

[5] Finally, it is contended that the control of the Central Pacific line from San Francisco to Ogden by the Southern Pacific is in violation of the Pacific Railroad Acts. The proofs show no foundation in fact for this contention. When this suit was brought, and since, the line was being maintained and operated in every particular required as a part of a continuous railroad from the Missouri river to the Pacific Coast. In conjunction with the Union Pacific there were through rates, through billings, and through freight, passenger, and mail trains. There were no criticisms of the track, the service, or the schedules. The government and the public were being served adequately. Those

statutes require physical connection with the Union Pacific to make a through line and the furnishing of equal advantages and facilities as to rates, time, and transportation without discrimination of any kind. If those requirements are met, it does not seem material whether they are performed by the Southern Pacific as lessee and stockholder or by the Central Pacific independently.

The petition is dismissed.

CARLAND, Circuit Judge (dissenting). It is difficult to determine from the opinion of the majority exactly upon what ground or grounds the bill in this case is dismissed. The opinion states that:

"Prior to the stock acquisition in 1899 and since there never was a time, in our opinion, when there was in any real substantial sense 'a natural and existing competition in interstate commerce' between the Southern Pacific and the Central Pacific within the intent of the Anti-Trust Act. * * * That competition of the kind mentioned might now result from an enforced independence of the two companies and a separation of their railroads may be true, but we do not think the statute was intended to create competition by destroying a proprietary relation formed long before its passage and by the very means of which a railroad system has been brought into existence."

If the language first quoted means natural and existing competition in fact, then it is entirely consistent with the claim of counsel for the United States, which is that no such competition existed or could exist by reason of the common control since 1899 of the Central Pacific by the Southern Pacific. If the language means that there could be no competition between the two railroad systems, then the language is inconsistent with the language which follows, wherein it seems to be conceded that but for the common control there would be competition. As the breaking up of an unlawful combination does not create natural competition, but simply removes the barriers which prevent the free flow of interstate commerce, the concession that there might be competition if the combination was broken is also a concession that there is natural competition which is suppressed by reason of the control of the Central Pacific by the Southern Pacific.

The combination which is complained of in this case is alleged to have originated in 1899 in the acquirement of all the stock of the Central Pacific by the Southern Pacific. The fact that prior to the passage of the Anti-Trust Law there had been a practical control of the Central Pacific by the Southern Pacific through a leasing arrangement in no way validates the present combination, if it be unlawful. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663; United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Delaware & Hudson Co., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836; Philadelphia, Baltimore & Washington R. R. Co. v. Schubert, 224 U. S. 603, 32 Sup. Ct. 589, 56 L. Ed. 911; Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417; United

States v. Kissel, 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681.

There does not seem to be any conflict in the authorities upon this proposition. The evidence in the record in my opinion establishes beyond question that the Southern Pacific, extending from San Francisco Bay to New Orleans, with its steamship connection with New York, is a natural competitor of the Central Pacific, both as to California-Atlantic Seaboard freight and central and western United States freight to and from California. A mere inspection of the different routes over which interstate commerce is moved through the El Paso and Ogden gateways would seem to show that the two roads are natural competitors. If they are competitors, and the Southern Pacific, as it is admitted, controls the Central Pacific, it follows that the free flow of interstate commerce is restrained. United States v. Union Pacific Railroad Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124; Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679.

I do not think the evidence shows that the Central Pacific and the Southern Pacific were created originally and have always continued to be one system. They have always been and are now operated as separate systems. The settlement by the United States of the debt of the Central Pacific in 1899 cannot be held to estop the United States from insisting at this time that the combination between the two roads is in violation of the Anti-Trust Act. It is not remarkable that in the proceedings resulting in the settlement, so far as they appear of record, the Anti-Trust Law was not referred to, as little attention was given in those days to the Anti-Trust Law of July 2, 1890.

Finally, I am unable to reconcile the decision of the Supreme Court in the case of United States v. Union Pacific Railroad Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124, with the conclusion reached by the majority in this case. The Union Pacific and the Central Pacific constitute one transcontinental line from Omaha, Neb., to the Pacific Coast. Of course, it would not be objectionable for the Union Pacific to control the Central Pacific, so far as anything in the record in this case is concerned, because it would simply be the same through line, with no competition involved as between these two roads; but the Supreme Court held in the case cited that the control of the Southern Pacific by the Union Pacific was a combination in restraint of commerce that should be broken up.

In this case the Southern Pacific, which the Supreme Court held was in competition with the Union Pacific, controls the Central Pacific, or another section of the through line from Omaha to the Coast. How is the decree of the Supreme Court in the Union Pacific Case to become effective, with the competitor of the Union Pacific controlling the Central Pacific? If it was unlawful for the Union Pacific, being one section of the through line, to control the Southern Pacific, why is it not unlawful for the Southern Pacific to control the other section of the through line. It is said in the opinion that there is no

evidence of complaint by shippers of the alleged unlawful combination. The Attorney General, in instituting this action, represents the public, including shippers.

For these reasons, briefly stated, I dissent from the conclusion reached by the majority.