57 F.Supp. 997 (1944)
In re LACLEDE GAS LIGHT CO. et al.
No. 2756.
District Court, E. D. Missouri, E. D.
August 25, 1944.
*998 David K. Kadane and Maurice C. Kaplan, both of Philadelphia, Pa., for Securities and Exchange Commission.
Richard Jones and Horace J. McAfee, both of New York City, for Ogden Corporation.
Henry J. Kaltenbach, of St. Louis, Mo., for Laclede Gas Light Co.
Joseph H. Grand, of St. Louis, Mo., for Laclede Power & Light Co.
Crawford Johnson, of St. Louis, Mo., for St. Louis Union Trust Co.
Samuel H. Liberman, of St. Louis, Mo., for Mississippi Valley Trust Co.
J. F. Handy, of Springfield, Mass., and Roscoe Anderson and W. R. Gilbert, both of St. Louis, Mo., for Massachusetts Mut. Life Ins. Co., John Hancock Mut. Life Ins. Co., New York Life Ins. Co., and Columbian Nat. Life Ins. Co.
HULEN, District Judge.
The Securities and Exchange Commission[1] by this action seeks an order to enforce and carry out a plan initiated before the Commission under Section 11(e) of the Public Utility Holding Company Act of 1935 by the Laclede Gas Light Company, Laclede Power & Light Company, and Ogden Corporation.[2] Certain of the security holders and Trustee in a mortgage, of Laclede Gas are the sole objectors to the plan before this Court. Ogden is a holding company, Laclede Gas and Laclede Electric are public utility companies.
As of December 31, 1943, among other public utility holdings, Ogden owned in excess of 73% of the Laclede Gas voting securities and in excess of 99% of the common stock of Laclede Electric. As a registered holding company Ogden has come under the ban of the Act.
*999 Reference is here made to certain sections of the Act involved in this action. Under the issues raised by the objectors we are concerned chiefly with Sections 11 (b), (e) and 26(c) of the Act and their effect upon Laclede Gas, Laclede Electric and Ogden in the filing of the plan under consideration.
Section 1 of the Act, after reciting history and illustrations that constitute an indictment of the holding company system in general, concludes:[3]
"(c) When abuses of the character above enumerated become persistent and wide-spread the holding company becomes an agency which, unless regulated, is injurious to investors, consumers, and the general public; and it is hereby declared to be the policy of this title, in accordance with which policy all the provisions of this title shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce; and for the purpose of effectuating such policy to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems, and to provide as soon as practicable for the elimination of publicutility holding companies except as otherwise expressly provided in this title. * * *"[4]
Paragraph 11 (b) of the Act reads in part as follows:
"(b) It shall be the duty of the Commission, as soon as practicable after January 1, 1938:
"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holdingcompany system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operation of such integrated public-utility system. * * *
"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system. In carrying out the provisions of this paragraph the Commission shall require each registered holding company (and any company in the same holding-company system with such holding company) to take such action as the Commission shall find necessary in order that such holding company shall cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is a holding company. Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company."
Paragraph 11(e) of the Act provides:
"(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to *1000 enforce and carry out the terms and provisions of such plan. If, upon such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed."[5]
Subparagraph (c) of Section 26 of the Act reads in part as follows:
"(c) Nothing in this title shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created prior or subsequent to the enactment of this title."[5]
The Act was passed by Congress in 1935. The Commission was without power to order compliance with Section 11(b) prior to 1938. As a gesture of cooperative compulsion, it was provided by Section 11(e) of the Act that any registered holding company or a subsidiary thereof could at any time after January 1, 1936, submit a plan "for the purpose of enabling such company or any subsidiary company thereof" to comply with the provisions of Subsection (b) of Section 11. If the plan so submitted was found necessary to effect the provisions of Subsection (b) and was fair and equitable to those affected by such plan, the Commission could approve the plan and "at the request of the company apply to a court, in accordance with the provisions of Subsection (f) of Section 18 of the Act to enforce and carry out the terms and provisions of such plan".[6]
In the year 1941, Laclede Gas, Laclede Electric and Ogden filed a plan with the Commission designed to effect compliance with Section 11(b) of the Act and to meet certain financial problems confronting them. While the plan was pending before the Commission, the Commission (on March 23, 1943) acting under Section 11(b) of the Act, instituted a proceeding directed to Ogden and its subsidiaries which include Laclede Gas and Laclede Electric. There was also pending before the Commission (filed February, 1943) at that time a plan which had been filed by Ogden and its subsidiaries, the purpose of which was to effect compliance by Ogden and its subsidiaries with the provisions of the Act and the terms of an amended plan of reorganization dated July 10, 1939 of Utilities Power & Light Corporation, predecessor in reorganization of Ogden. These three proceedings were consolidated. On May 20, 1943, the Commission issued its finding, opinion and order in the consolidated proceeding, which order, among other things, pursuant to Section 11(b) of the Act, directed Ogden to divest itself of all interests in public utility companies; directed that Laclede Gas take such steps as may be necessary to recapitalize, so as to distribute voting power fairly and equitably among the security holders of such company; and approved that portion of the Ogden plan which proposed that the Laclede Gas would be recapitalized in such a manner as to reduce substantially its outstanding debt, eliminate its preferred stock dividend arrears and convert its preferred and common stock into a single class of stock. The plan now before this Court, filed by Laclede Gas, Laclede Electric and Ogden is designed to comply with requirements of the order made in the consolidated case and to effect a reorganization of Laclede Gas as set out in the Ogden plan. In the proceeding before the Commission briefs and oral argument were waived except on the question raised by objectors to the provisions of the plan filed by Laclede Gas, Laclede Electric and Ogden, providing that the 5½% 1919 bonds, Series C and D of Laclede Gas be discharged by payment in cash at the principal amount thereof with interest, but without redemption premium. No question is raised before this Court as to the procedure before the Commission as to notice, hearing, etc.
While only a portion of the plan is now under attack, other provisions of the plan must be considered in connection with the portion under attack, in order to pass upon the question before the court. Briefly the plan provides as follows:
"1. Sale of the electric properties operated by Laclede Electric, including properties *1001 leased from Laclede Gas, to Union Electric Company of Missouri at a base sales price of $8,600,000, and allocation of $2,200,000 of such sales price to Laclede Gas as its share of such proceeds of sale;
"2. Transfer to Laclede Gas by Laclede Electric of its remaining assets (except cash and the 233,112 voting trust certificates of Granite City Generating Company which certificates are to be transferred to Ogden) estimated, as of December 31, 1943, at approximately $14,300, and the dissolution of Laclede Electric, after the discharge of its liabilities;
"3. Issuance of fourteen shares of new common stock of Laclede Gas, $4 par value per share, in exchange for each share of present 5% Cumulative Preferred Stock, $100 par value, of Laclede Gas, and the issuance of one share of new common stock of Laclede Gas, $4 par value, in exchange for each share of present common stock of Laclede Gas, $100 par value;
"4. Issuance to Ogden (in addition to 149,261 shares to be received by it in exchange for its present holdings of Laclede Gas preferred and common stocks in the ratios provided for the No. 3 above) of 2,000,000 shares of new common stock of Laclede Gas, $4 par value, in return for;
"(a) Cancellation of $2,000,000 principal amount Collateral Trust 6% Notes of Laclede Gas owned by Ogden, after payment of accrued interest thereon to the effective date of the plan;
"(b) Payment to Laclede Gas by Ogden of $905,000 cash;
"(c) Payment to Laclede Gas of Laclede Electric's share of the cash proceeds from the sale of the electric properties, less such portion of such proceeds necessary to discharge in full all liabilities of Laclede Electric not assumed by Union Electric. Such payment to Laclede Gas is estimated to be $6,175,000 as of May 31, 1943;
"(d) Assets transferred to Laclede Gas by Laclede Electric as provided in paragraph No. 2 above;
"It is provided in the plan that if the cash payment mentioned in (c) above falls below $5,975,000, the number of shares issuable to Ogden will be decreased by a number of shares which, in the opinion of the proponents of the plan, will fairly compensate for any such decrease in the amount of cash to be received by Laclede Gas; or, if Ogden so elects, it will pay to Laclede Gas in cash a sum sufficient to increase to $5,975,000 the amount of cash to be received by Laclede Gas. The maximum cash payment, to Laclede Gas is to be $6,175,000. Any cash remaining in Laclede Electric's treasury after such maximum payment thereof is to be distributed pro rata to the stockholders of Laclede Electric.
"5. Payment by Ogden to the minority holders of the stock of Laclede Electric, upon surrender for cancellation of such stock of a cash amount equal to their pro rata share in the net assets of Laclede Electric after the consummation of the sale, and after payment to Laclede Gas of its share of the proceeds of such sale ($2,200,000);
"6. Sale by Laclede Gas of $19,000,000 principal amount of new first mortgage bonds and $3,000,000 principal amount of serial debentures, and the use of the proceeds together with other available cash, as hereinafter in paragraph 7 set forth;
"7. Payment and discharge, at the principal amount thereof, together with accrued interest thereon to the effective date of the plan, of Laclede Gas' 1904 5% Bonds outstanding in the hands of the public, and its outstanding 1919 5-1/2% Bonds aggregating $31,961,105 principal amount, as of December 31, 1943;
"8. Sale by Ogden of all of the new common stock, which it will acquire by virtue of Laclede Gas' reorganization, to the public".
Prior to approval of the plan certain amendments were required by the Commission as a condition to its approval. Amendments were made. The plan after various amendments, was finally approved May 27, 1944. Upon the request of the companies the Commission applied to this Court for an order to enforce and carry out the plan as provided in Section 11(e) of the Act. Request was granted and the plan is now before this Court.
The record here consists of the record made before the Commission.
During the hearing objectors offered to introduce evidence that had not been offered at the hearing before the Commission. Objection to the offer was sustained after a showing that objectors had been accorded an opportunity to offer evidence before the Commission and no claim was made by objectors that there was any reason why the evidence could not have been presented before the Commission. Objectors took the position they were entitled to a trial de novo.
*1002 This case is before the Court under Section 11(e) of the Act. Provision is made for a hearing after notice. Under Section 24(a) of the Act it is provided that any person aggrieved by an order issued by the Commission may obtain a review in the Circuit Court of Appeals. The Court of Appeals may  "affirm, modify, or set aside such order, in whole or in part." No such power is given to this Court under Section 11(e) proceedings. This Court can only "approve" or disapprove of the plan. The Act provides that in hearing before the Court of Appeals, under Section 24(a) the Court may hear "additional evidence", if it be shown to the satisfaction of the Court that such additional evidence is material and there were reasonable grounds for failure to adduce the evidence in the hearing before the Commission, then the Court may "order such additional evidence to be taken before the Commission * * *."
Reading the Act as a whole we believe it provides that primarily exceptions to orders of the Commission by objectors shall be before the Court of Appeals, but there being no provision to the contrary, they may appear at this hearing under Section 11(e) and object to approval of the plan. However, we can see no more reason for permitting evidence to be offered, other than the record made before the Commission in a hearing under Section 11(e) than in a hearing under Section 24(a) of the Act, and especially do we believe this should be the rule when the Court of Appeals may "modify" or "set aside" order of the Commission "in whole or in part" and yet is restricted in the receipt of evidence, solely to send the case back to the Commission to hear such additional evidence. A reasonable interpretation of the Act does not permit a more liberal rule on hearing additional testimony in a case before the Court under Section 11(e) than under Section 24(a) of the Act.
A reading of the Act plainly discloses that it was the purpose of Congress to set up a body in the Commission that would be especially trained and versed in matters relating to Public Utilities. These are complex matters calling for the services of experts. The Commission has authority to employ them (Section 31). Objectors' offer of proof indicates clearly that they proposed to throw the case wide open for offering additional evidence. An expert was to testify (admissibility of which being questioned under any circumstances) that the plan was not fair and equitable, which would have called for evidence pro and con ad infinitum. To hold that a matter of the character now before this Court, after it has been before the Commission for years and the Commission (with the aid of its corps of employees, including "attorneys, examiners and experts as shall be necessary for the transaction of its business") has arrived at a conclusion, made findings and issued orders, that this Court shall discard that record and proceed to make a new one (and a new one should be made or none at all) would in our opinion do violence to the most elementary principles of administrative law. We know of no such procedure on appeals from other administrative bodies, we have been cited to none and we shall not be the first to inaugurate it.

The Issues
Under the provisions of Section 11(e) of the Act, we pass on the question, is the plan as approved by the Commission fair and equitable and appropriate to effectuate the provisions of Section 11 of the Act? If it is, the plan should be approved, subject to decision on the points raised by the objectors.
On April 1, 1904, Laclede Gas executed a mortgage to secure an issue of $20,000,000 refunding an extension mortgage 5% gold bonds due April 1, 1934. $10,000,000 of these bonds are held under the 1919 mortgage; and $8,961,105 of these bonds, which have been extended to April 1, 1945, are publicly owned. There are outstanding $17,500,000 of 5½% bonds of Series "C" and $5,500,000 of 5½% bonds of Series "D" issued under a mortgage executed by Laclede Gas on January 1, 1919, which are subject to the lien of the 1904 mortgage securing the above mentioned first mortgage collateral and refunding and extension mortgage bonds. Individual objectors are the holders of $1,313,000 of the total outstanding $23,000,000 1919 5½% bonds, Series C and D. No other exception has been registered to the plan before the Court by a bondholder. The issues raised by the objectors result from a provision in the bonds held by them that such bonds "may be redeemed by the company at any time at par and accrued interest and such premium, if any, as the Board of Directors may determine at the time of issuance of said bonds." The plan provides for the payment and discharge of the bonds without the payment of the premium and objectors assert that in this respect the plan violates the terms of *1003 the bond contract. The redemption premium if payable in 1944 would aggregate $570,000.
Does the payment of the 1919 bonds, without premium, under the plan proposed by the Laclede Gas, Laclede Electric and Ogden and approved by the Commission under the circumstances which induced submission of the plan to the Commission, come within the terms of the mortgage calling for payment of premium if the bonds are "redeemed by the company?" Objectors assert that it does, because: "Congress has not endeavored to give the Securities and Exchange Commission authority to compel bondholders to accept acceleration of their bonds other than as provided by their contract, and (2) the Securities and Exchange Commission goes beyond its powers and violates the bondholders' rights, taking their property contrary to the Fifth Amendment of the United States Constitution".
The Commission and proponents (Laclede Gas and Laclede Electric and Ogden) answer that the plan while being proposed by Laclede Gas, Laclede Electric and Ogden, was presented under the terms of the Act in anticipation of its enforcement as to them, under Section 11(b) and therefore is not, in a legal sense a voluntary act of the company; that the plan is fair and equitable and does not violate the terms of the Act.

Opinion
Approval of the plan turns on decision of the following questions: (1) Is the plan an involuntary one and in the particular objected to? (2) If involuntary, has the Commission power to authorize action contemplated by the plan and here objected to? (3) Is the plan fair and equitable and appropriate to effectuate the provisions of Section 11 of the Act? If these questions can be answered in the affirmative the plan should be approved, otherwise not.
I. Whether the plan is a voluntary one, as claimed by the objectors, or involuntary as asserted by the Commission and proponents, depends on the facts causing its submission to the Commission.
We examine first the chain of events surrounding submission of the plan to the Commission.
Ogden and certain of its subsidiaries, including Laclede Gas and Laclede Electric, filed application with the Commission on Feb. 27, 1943, for approval of a plan, the purpose of which was to effect compliance by Ogden and its subsidiaries with Section 11(b) of the Act and the terms of an Amended Plan of Reorganization, dated July 10, 1939 of Utilities Power & Light Company, predecessor to Ogden. Order of the Commission in Utilities Power & Light Company case and confirmed by the District Court of the United States for the Northern Division of Illinois, Eastern Division, provided for submission of a plan by Ogden. The plan now before the Court was originally filed September the 4th, 1941 with the Commission, and has been amended several times since. The Commission instituted proceedings on March 23, 1943 under Section 11(b) of the Act, directed, among others, to Ogden, Laclede Gas and Laclede Electric. These three proceedings were consolidated and out of the consolidated hearing came an order, on May 20th, 1943, which was unappealed from and is now final. Subsequently the plan before the Court, filed by Ogden, Laclede Gas and Laclede Electric was amended and in final form was designed to comply with the order of the Commission of May 20, 1943 in the consolidated case.
Let not the effect on this case of the finality of the findings and order in the consolidated case be overlooked. Virtually every finding and order which is being contested in this Court is to be found in the Commission's findings and order in the consolidated case. No appeal having been taken in the consolidated case and time for appeal having expired it is a matter of serious doubt whether they are now in a position to complain of findings and orders in the consolidated case, which are now in this case if made to carry out the provisions of the order made by the commission in the consolidated case.
The following is an excerpt from the opinion of the Commission, in the consolidated proceeding:
"On the basis of the above facts, we find that Laclede Gas should be recapitalized for the purpose of fairly and equitably distributing voting power among its security holders. The company's troubled financial history and its continued inability to refund or otherwise meet its maturing long term obligations indicate that a comprehensive and thoroughgoing reorganization is essential if the company is to avoid proceedings under Chapter X of the Bankruptcy Act [11 U.S.C.A. § 501 et seq.] In such reorganization, it appears necessary that debt *1004 be reduced substantially, preferred stock arrears eliminated, and the property accounts adjusted to modern accounting and regulatory standards.
"In recognition of these problems, the plan under Section 11(e) filed by Ogden and subsidiary companies considered herein proposes a recapitalization of Laclede Gas wherein the debt will be reduced substantially, preferred stock dividend arrears eliminated, and outstanding preferred and common stocks converted into a single class of common stock. In the light of the above, we find that such objectives are necessary to effectuate the provisions of Section 11(b) and are fair and equitable to the persons affected thereby. Jurisdiction is reserved as to all steps to be taken in connection with such reorganization." (Emphasis by the Court.)
Even if it were conceded that the plan before the Court was originally filed voluntarily by Ogden, Laclede Gas and Laclede Electric, as claimed by the objectors, would it be possible to separate the findings and opinion of the Commission made in the consolidated case from those orders which resulted from the plan proposed by Laclede Electric, Laclede Gas and Ogden under Section 11(e) of the Act and which plan as subsequently amended is now before the Court, and those orders which resulted from the proceeding initiated by the Commission under Section 11(b) of the Act, and those orders resulting from the filing of the Ogden plan to effect compliance by Ogden with the provisions not only of Subsection (b) of the Act, but of the terms of the amended plan of the reorganization of the Utilities Power & Light Corporation, its predecessor, as approved by the Commission and United States District Court. The orders made in the consolidated case could have had their basis in fact, upon the proceeding initiated by the Commission. Regardless of which case they originated from, they all had as their purpose compliance with Section 11(b) of the Act. Certainly Ogden had no choice as successor of Utilities Power & Light Corporation but to submit a plan. That plan was not a voluntary one. It had behind it the compulsion of the direction of the Commission as well as a Federal Court. Is the plan before the Court filed by Ogden, Laclede Gas and Laclede Electric to comply with Section 11(b) of the Act, voluntary? This latter plan cannot be separated from the Ogden plan and proceedings, as successor to Utilities Power & Light Corporation. The substance of the plan in as far as we are here concerned, is the same in both cases. When the order of the Commission in the consolidated case is read in the light of the finding of the Commission and the order in the case before the Court, i.e., "The plan before us filed by Laclede Gas, et al., is designed to comply with the requirements of our order of May 20, 1943" (in the consolidated case) we can not find that the plan (and orders of the Commission) resulted solely from the plan offered by Ogden, Laclede Electric and Laclede Gas, and was uninfluenced by proceedings on the initiation of the Commission.
Assuming the orders complained of resulted from the plan submitted by Laclede Gas, Laclede Electric and Ogden, and now before this Court  Ogden has been ordered by the Commission, as a holding company, to dispose of its holdings in Laclede Gas and Laclede Electric. No one challenged the propriety of the order of the Commission in this respect. Some plan was required, either from Ogden and its subsidiaries or the Commission, regardless of the desires of Laclede Gas, by which this mandate could be carried out. To do this the Commission finds that Laclede Gas must retire its 1919 bonds because they constitute a claim upon the properties of Laclede Electric, which claim is disputed by Laclede Electric. The Commission has found that the common stock of Laclede Gas possesses approximately 82% of the voting power of the company, and that on the basis of the company assets this is out of proportion to its equity. The Commission found that under Section 11(b) of the Act the company should be reorganized for the purpose of fairly and equitably distributing voting power among its security holders. It further found, "that in such reorganization", it is necessary that the debt be reduced. The authority of the Commission to order a change in the corporate structure for the above purpose is expressly provided in the Act. Some plan was required regardless of the desires of Laclede Gas, by which this mandate could be executed. The Commission found the plan was "entirely appropriate" to comply with its orders. These are matters peculiarily within the discretion and power of the Commission, and if based on evidence, we deem this Court bound by the finding.
Having held the plan is not a voluntary one, does it follow that the part *1005 of the plan attacked by objectors is involuntary on the part of Laclede Gas? We do not believe the Act should be construed to provide, and we do not so hold, that because Laclede Gas is under legal compulsion to submit a plan that Laclede Gas could voluntarily use such a situation as an opportunity to divest itself of legal obligations. Which leads to the inquiry, was inclusion in the plan, provision for retirement of the 1919 bonds a necessary part of the legal compulsion? Could the orders of the Commission in response to either of the three proceedings have been executed without retirement of the 1919 Bonds? Could a plan, reasonable in its provisions have been submitted, leaving the 1919 bonds in effect and still have met the legal compulsion of the Commission's orders. Objectors attempt to narrow the question to "non-payment of the premium", as being a voluntary act. In this contention we cannot agree, because if retirement of the 1919 bonds results from legal compulsion, the condition upon which payment of premium becomes due under the bond or mortgage contract does not exist.
Take first the order of the Commission that Ogden divest itself of its interest in Laclede Gas and Laclede Electric. No one questions the power of the Commission to make that order. On that point and its relationship to retirement of the 1919 bonds the Commission has found: "(2) Solution of Ogden's problems under Section 11 (b) of the Act also necessitates retirement of the Laclede Gas 1919 bonds. Ogden has been ordered under Section 11 (b) to divest itself of its interests in Laclede Gas and Laclede Electric. However, as we have noted, so long as there is dispute between Laclede Electric and the Trustee under the 1919 bonds as to the extent of the lien, the securities of Laclede Electric or its properties are not in salable form. A purchaser thereof would simply be buying a law suit. The same is true of Ogden's holdings in Laclede Gas, although to a lesser extent. Thus, we believe that the retirement of the 1919 bonds, with its consequent elimination of the dispute as to the extent of the lien on the electric properties, is necessary to enable Ogden to divest itself of its interests in the two companies in a feasible manner." (Emphasis by the Court.)
Objectors seek to nullify the effect of the above finding by several ingenious arguments. They assert that the effect of clearing the title to the Laclede Electric property would be solely to enhance the value of Ogden's stock holdings. That might be the result as objectors view the transaction, but we think the better interpretation is that by clearing the lien claim, loss to Ogden would be mitigated. A further justification for the requirement is to avoid putting on the market securities of doubtful value, for a known cause, and a cause which is subject to removal and thereby would result in public protection in their purchase. The Commission's order is that they be disposed of by Ogden and distributed to the public. Power of the Commission in a case where it has ordered dissolution of a holding company is not confined to that order alone. It can and should determine and direct how that order is to be obeyed. That it is doing by its order in this case. That it has seen fit to order a procedure that will eliminate a lien claim on certain property and as a result of its act thereby remove a possible cause of loss to stockholders of the company owning that property, does not condemn its act in our opinion.
"First, it was the intention of Congress in enacting the Public Utility Act of 1935 to preserve the values of securities and not to destroy or diminish their values." In re Securities and Exchange Commission (Otis & Co.), 3 Cir., 142 F.2d 411, 419.
But the objectors assert, there is no ground for dispute as to the lien securing the 1919 Bonds covering certain property of the Laclede Electric. Sufficient to answer that the Commission finds there is a dispute as to the lien coverage. Litigation was at one time started on the question. Certainly this Court can not now try that collateral issue.
Objectors except to the "windfall" holding of the Commission on the premise that there is no valid ground to dispute lien of the 1919 mortgage on the Laclede Electric property. The "windfall" would result by retiring the bonds secured by a first mortgage, then the 1919 second mortgage bonds would become first mortgage bonds unless paid at the same time. We repeat that the holding of the Commission, that such a dispute (not the basis therefor) exists is not controverted and we are not in a position to try the merits of the respective claims of lien or no lien.
Further argument is advanced by the objectors that the bondholders did not request any voting rights in Laclede Gas. In this *1006 statement we agree with objectors. But we can not see that it has any bearing on the question now being considered. There is no such requirement provided by the Act as a premise for action by the Commission and we are not at liberty to write one into the Act.
Correlated with the Commission's order is a finding: "B. We are of the opinion that retirement of the 1919 bonds at principal amount plus accrued interest to the effective date of the plan constitutes fair and equitable treatment for the holders of those bonds. Laclede Gas, as we have heretofore observed, absent the plan, is in serious danger of defaulting on its first mortgage bonds less than a year hence. There is thus serious danger that Laclede Gas would go into bankruptcy, were it not for the reorganization provisions of Section 11 of the Act. Aside from the practical hardships commonly suffered by senior security holders during the course of an extended bankruptcy proceeding, the maturity of the 1919 bonds would doubtless be accelerated in the course of such a proceeding and thus their claim in the reorganization would be measured by the principal amount, exclusive of the redemption premium. In such a reorganization, it would probably be necessary for the 1919 bondholders to take new stock for a portion of their claim. These dangers are being averted only because of the provisions of the plan before us whereby substantial new money is being put into the gas company by Ogden".
Objectors frankly state they are not interested in this phase of the troubles of Laclede Gas. We quote from their brief on the subject: "These bondholders are willing to take their chances in bankruptcy because they are confident that in bankruptcy they would obtain their full contract rights".
If the protection of the value of the 1919 bonds were the sole problem before the Commission, perhaps the Commission could take the cold, detached position of objectors, but fortunately for others who have rights in the premise, such is not the case.
We are also informed by objectors that there is no basis for a finding by the Commission that Laclede Gas is in danger of bankruptcy because an officer of Ogden testified it was solvent. Failure of Laclede Gas to meet its obligations as they mature has resulted in advancing the due date on some of its bonds on more than one occasion. Such history is better testimony of the fate awaiting the company than a conclusion that it is solvent as of a date subsequent to such postponement.
In determining whether voting power could be fairly and equitably distributed among the security holders of Laclede Gas without retirement of the 1919 bonds, the Commission considered the matter in connection with other questions. There is no claim by anyone that the plan adopted is the only possible plan to accomplish some of the purposes sought. Very few plans are in fact. The opinion of the Commission reads: "The method of retiring all the 1919 bonds may not be the only possible method to prevent the windfall and ensure that the 1919 bonds will not receive unduly favorable treatment at the expense of the stockholders. For example, it might be-possible to adjust the interest on the 1919 bonds to reflect their substantially improved position as a result of the reduction of the debt to $22,000,000."
Considering the number of objectives before the Commission and various orders of the Commission to be complied with, one or more of which could not be carried out without retirement of the 1919 bonds, the finding of the Commission: "We are of the opinion, however, that due to the complex mortgage situation of the company as hereinabove described, the method pursued in the plan is entirely appropriate in this case" is justified in our opinion.
We believe it follows that had the proponents of the plan not presented a plan, and a plan calling for retirement of the 1919 bonds, eventually everything which is now objected to would have been forced on proponents by the Commission's order. At this point it might be observed; what purpose could the Commission have had in filing its own proceeding, but to be prepared to take that action, should proponents withdraw their plan.
The passage of the Act constituted a charge, an indictment with their crimes endorsed on the bill, against holding companies and their subsidiaries, with a "death sentence" against certain holding companies, of which Ogden was one. The terms of the Act informed holding companies and their subsidiaries that they must perform certain acts after a certain day (January 1, 1936) under Section 11 (e) of the Act, or the Commission using power granted it under the Act could proceed to compel performance under Section 11 (b) of the Act. To classify the act as voluntary, in a case *1007 where a holding company or one of its subsidiaries, instead of waiting for the Commission to act and compel compliance, comes before the Commission with a plan, would be akin to classifying as voluntary, the conduct of a defendant in a criminal court, who comes in before the day of trial and enters his plea or in a civil case, a defendant, instead of awaiting trial, judgment and execution, anticipates such action by presenting a plan of settlement before trial and requests approval of the Court. Similar claim to that now asserted by the objectors and under like circumstances has been before the Commission and denied. Like claim has been before the Federal Appellate Court and overruled.
We find no basis for overruling the finding of the Commission that the plan now before the Court and in the particulars objected to is an involuntary plan, submitted under legal compulsion to comply with the mandate of the Act and the ruling of the Commission.[7]
II. The Commission has power to order a holding company to divest itself of its interest in public utility companies. Ogden, as a holding company, has been ordered by the Commission to divest itself of its holdings in Laclede Gas and Laclede Electric. This part of the Commission's orders is not challenged by the objectors.
The Commission has power under the Act to require a change in the corporate structure of Laclede Gas for the purpose of causing equitable redistribution of the voting power among the security holders. This authority is specifically given by the Act.
Objectors question not the power of the Commission to make such an order, but the particular way in which it has been ordered. Does the Commission have power to require in this case a change in corporate structure of Laclede Gas, by retirement of the 1919 bonds for the purpose of providing a means to accomplish execution of the orders of the Commission? Answer to this question turns on the Commission's finding and the basis therefor.
In the consolidated case the Commission, after reciting the capital structure of Laclede Gas and alluding to its precarious financial condition, found as follows: "On the basis of the above facts we find that Laclede Gas should be recapitalized for the purpose of fairly and equitably distributing voting power among its security holders". (Emphasis added.)
As heretofore noted, the ruling in that case was unappealed from and has now become final and, if within the Commission's power, is binding on the parties to it.[8]
In the order of the Commission approving the plan now before this Court we find this ruling: "In our findings and opinion of May 20, 1943 (consolidated case) we pointed out that the common stock of Laclede Gas possesses approximately 82% of the voting power of the company, which, on the basis of the company's asset position and earnings history, is far out of proportion to its equity. We concluded, therefor, pursuant to the provisions of Section 11 (b) of the Act, that the company should be reorganized for the purpose of fairly and equitably distributing voting power among its security holders. We further found that, in such reorganization, it appears necessary that debt be reduced substantially, preferred stock arrears eliminated, and the property accounts adjusted to eliminate inflationary items".
Under the provisions of Section 11 (b) (2) of the Act it is provided: "Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company."
In addition to the provisions of the plan now before the Court, meeting the requirement of the Commission that Laclede Gas recapitalize for the purpose of fairly and equitably distributing voting power among its security holders, the Commission states a further reason for retirement of the 1919 bonds: "A. As stated, we are of the opinion that the retirement of the 1919 bonds is a consequence of the requirements of Section 11 (b) of the Act. This is due to the necessity under Section *1008 11 (b) (2) that Laclede Gas reduce its indebtedness, and to the necessity under Section 11 (b) that Ogden divest itself of its entire interest in the gas and electric properties of Laclede and Laclede Electric (which we have heretofore ordered)".
The Commission found in the consolidated case: "We also find (in the Consolidated case), pursuant to the provisions of Section 11 (b) (2), that Ogden Corporation constitutes an undue and unnecessary complexity in the Ogden holding company system and that it should take appropriate steps to divest itself of all of its interests in holding company and public utility subsidiaries and to cause its elimination as a public utility holding company; provided, however, that in the case of The Laclede Gas Light Company  such divestment shall not be effected by means of the sale of securities prior to the recapitalization of such companies to the extent necessary to comply with Section 11 (b) (2)".
And in conformity therewith we find in the Commission's order and plan before the Court:
"There is a further (and quite independent) reason why the retirement of the 1919 bonds is necessary to enable Laclede Gas to reduce its indebtedness in conformity with Section 11 (b) (2): In order to obtain cash to make the necessary debt reduction, the electric properties owned by Laclede Gas and leased to Laclede Electric must be sold. But prompt sale of the electric properties without simultaneous retirement of the 1919 bonds is not feasible, since there is a serious and long-standing dispute between Laclede Electric and the Trustee under the 1919 bonds as to the extent of the bondholders' lien on the electric properties as well as whether the electric properties may be sold at all without retiring all of the 1919 bonds. Thus, we are of the opinion that the retirement of the 1919 bonds is a proximate result of the necessity of reducing Laclede Gas' indebtedness, and the sale of the electric properties to raise the cash needed for that purpose.
"(2) Solution of Ogden's problems under Section 11(b) of the Act also necessitates retirement of the Laclede Gas 1919 bonds. Ogden has been ordered under Section 11(b) to divest itself of its interests in Laclede Gas and Laclede Electric. However, as we have noted, so long as there is dispute between Laclede Electric and the Trustee under the 1919 bonds as to the extent of the lien, the securities of Laclede Electric or its properties are not in salable form. A purchaser thereof would simply be buying a law suit. The same is true of Ogden's holdings in Laclede Gas, although to a lesser extent. Thus, we believe that the retirement of the 1919 bonds, with its consequent elimination of the dispute as to the extent of the lien on the electric properties, is necessary to enable Ogden to divest itself of its interests in the two companies in a feasible manner."
Orders, otherwise beyond the powers of the Commission became valid, when based upon appropriate finding by the Commission.[9] The record upon which these findings is based and upon which the Commission reached its conclusion not only appear in a case which has become final but is not challenged by objectors.
We come to the sole objection. Section 26(c) of the Act is cited in support thereof. The pertinent part of which reads: "Nothing in this title shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created prior or subsequent to the enactment of this title, * * *."
It is the objectors' position that under Section 26(c) of the Act the Commission is without power to approve a plan that is contrary to the mortgage contract requiring payment of premium on retirement of bonds prior to maturity. Before there can be impairment of a contract there must be an obligation of the contract which has been impaired. The terms of the mortgage securing the 1919 bonds provide: "If the company shall elect to redeem any of the bonds " (emphasis added) in such event the bonds may be redeemed by the company at par and accrued interest, and the premium, which is the present bone of contention. It is our opinion that under the terms of the mortgage securing the 1919 bonds and plain meaning of the terms used, that the premium is due in one event and only one event; "if the company shall elect to redeem any of the bonds", and not if the company is forced to redeem the bonds by operation of law. Action by legal compulsion is not an election by the *1009 company. It is an election by the Commission. The event calling for payment of a premium on retirement of the bonds is not found in the record now before the Court. The provisions of the contract requiring payment of premium does not apply to a situation of the character here presented. This Court cannot write into the contract an obligation that is not there by action of the contracting parties. The terms of the mortgage, to support objectors' position would have to read in substance  "If the company shall elect to redeem the bonds  or be forced by operation of law to redeem the bonds", then the premium shall be due and payable. On the contrary, Laclede Gas is in the position of being forced to retire the bonds in order to comply with a law passed by Congress. There is no claim that the record indicates that there was any intention on the part of Laclede Gas to retire its 1919 bonds, absent its mandatory obligations to meet the requirements of Section 11(b) of the Act and orders of the Commission. We think the case of City National Bank & Trust Co. v. Securities and Exchange Commission, 7 Cir., 134 F.2d 65, loc. cit. 68-69, is in point: "There can be little, if any, doubt, so we think, but that the provisions concerning redemption had to do solely with voluntary action on the part of the corporation. The debentureholder was without right to require redemption. That was a right accorded to the corporation, to be exercised solely `at the option of the company.' It is only upon the exercise of such option that the agreement requires the payment of a premium. Such option lodges in the corporation the discretion to mature the debentures at a date earlier than that otherwise provided. While it is true that the payment of premium was a form of compensation to the debentureholders, nevertheless the redemption provision was for the benefit of the corporation, which could be utilized only at its election. The language plainly indicates that the parties did not contemplate that the redemption provision should be effective upon action by the corporation as a result of the Commission's order. Action under legal compulsion is the antithesis of action by election or `at the option' of the moving party." (Emphasis added.)
We think the opinion of the 8th Circuit Court of Appeals in the case of Megan v. Updike Grain Corp., 94 F.2d 551, loc. cit. 553, is in point also: "The principle of frustration of contracts, or of impossibility of performance, is of ancient origin, and is applicable to a great variety of contracts. The rule deduced from the decisions of the Restatement of the Law of Contracts, § 288, is as follows: `Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears."
Objectors insist that the ruling here indicated by this Court, can only apply in case of liquidation of Laclede Gas. We do not believe that the continued existence of Laclede Gas under the plan, changes the effect of the Commission's orders, and makes a forced redemption or election by the Commission of the 1919 bonds a voluntary redemption or election to do so by the company. The Commission has ordered that Ogden must dispose of its holdings in Laclede Gas and Laclede Electric. Objectors' counsel stated in oral argument  "Ogden was born with a death sentence under the Act". The Commission has found that Ogden cannot comply with the requirements of the Act without a change in the financial structure of Laclede Gas, including payment of the 1919 bonds. Laclede Gas has been ordered to recapitalize for the purpose of fairly and equitably distributing voting power among its corporate security holders, and the Commission has found that payment of the 1919 bonds is necessary for that "purpose". To meet these two demands growing out of orders of the Commission, the act contemplated by Laclede Gas and here challenged, stands as high in legal effect in our opinion as if the action was being taken by Laclede Gas under an order of dissolution from the Commission instead of an order of dissolution of Ogden. All the orders would come from the same source and have the same foundation. If one is legal it follows in our opinion that the other would be legal. See New York Trust Co. v. Securities and Exchange Commission, 2 Cir., 131 F.2d 274, loc. cit. 276: "Where, through no fault of either party, something necessary for the continued performance of a contract goes out of existence because of some unforeseen circumstance and none *1010 of the parties have assumed that risk the contract is regarded as charged with the implied condition that if what is necessary to performance becomes unavailable the contract is no longer binding and further performance is excused. Texas Co. v. Hogarth Shipping Corp., 256 U.S. 619, 41 S. Ct. 612, 65 L.Ed. 1123; Chicago, Milwaukee & St. Paul R. Co. v. Hoyt, 149 U.S. 1, 13 S.Ct. 779, 37 L.Ed. 625."
To like effect is the case of In re Securities and Exchange Commission, 3 Cir., 142 F.2d 411, loc. cit. 419: "Though the preferred stockholders of Power have contract rights which entitle them to the payment of $100 a share and accumulated dividends on liquidation or dissolution of Power, those rights, at least in the absence of insolvency, have not matured and cannot mature for the reason that the congressional mandate contained in the Act strikes across contract rights and the maturities embraced by them, severing them."
This concept of the law of contracts announced with regard to proceedings under the Securities and Exchange Commission is not a jus singulare. See the case of U. S. v. Southern Pacific Co., 1921, 259 U.S. 214, loc. cit. 234, 42 S.Ct. 496, 66 L.Ed. 907.
We therefore hold that under the plan before this Court there will be no redemption of 1919 bonds, at the "election" of the Laclede Gas, therefore no obligation created under the contract which can be breached by execution of the plan, and section 26(a) of the Act is without application and it is within the power of the Commission under the Act to direct or approve a plan providing for retirement of the 1919 bonds without payment of premium.
III. Having held the provisions for payment of premium of the mortgage securing the 1919 bonds not applicable to the situation now confronting Laclede Gas, the sole question remaining is, has the value of the bondholders' rights been recognized under the plan so that the amount they are to receive is the equitable equal of their present holdings? Is the plan fair and equitable and appropriate to effectuate the provisions of Section 11? At the outset we think recognition should be given to the history of these proceedings. They have been before the Commission for several years. The Commission has held extended hearings. It has given all parties a chance to be heard both on factual and legal questions. The order and finding of the Commission now before the Court is the consummation of that proceeding. Under these circumstances the findings of the Commission if supported by substantial evidence should be conclusive.[10]
Is payment to the 1919 bondholders of the face value of their bonds plus accrued interest the fair equivalent of the rights surrendered in the bonds? The Commission bases its findings on an exhaustive examination of the earnings of Laclede Gas over a period of years and its anticipated earnings. The Commission is especially qualified by experience under the Act for such an investigation. They are experts in that field. The finding is: "As noted hereinbefore, the plan provides for the payment and discharge, at the principal amount thereof, together with accrued interest thereon to the effective date of the plan, of the $8,961,105 1904 5% bonds and the $23,000,000 1919 5½% bonds, Series C and D. We have previously pointed out that the 1904 5% bonds originally matured in 1934 and have been extended on three separate occasions, the present extended maturity date being April 1, 1945. Such extension agreement does not provide for the payment of any premium in the event of a redemption or retirement of such bonds prior to April 1, 1945. On the basis of the record, considering the asset and earnings coverage of such bonds and the imminence of their maturity, we have no hesitation in concluding that the proposed treatment of such bonds is fair and equitable to the persons affected thereby".
The holders of the 1919 bonds will receive the face value of their bonds plus accrued interest. There is a first mortgage bond issue senior to the 1919 bonds. In payment of the first mortgage bonds they will receive face value of the bonds plus accrued interest. Aside from the contract provisions of the bonds providing for payment of premium which we have held inapplicable under the facts in this case, there would appear to be no more justifiable reason for paying a premium on the 1919 bond issue than on the first mortgage bond issue. If the Commission had provided for payment of the 1919 bonds at par plus a premium, there would no *1011 doubt have been a complaint from other security holders and probably from the first mortgage bondholders, that a preference was being granted a junior bond issue. To pay a premium on the 1919 bonds would set in motion a chain of events of complaints of preferential treatment and demands for like consideration. The granting of any preference immediately presents the questionwhere shall it stop? Likewise precedents are so established. So the bare statement of objectors that $570,000 would pay the premium on the 1919 mortgage bonds and that amount of money could be paid without upsetting the plan, is not determinative of the question thus presented. And the fact remains that the same contention that is now being made by the objectors was made before the Commission. The Commission could have made that requirement as a condition to approving the plan, but did not do so, and we believe that is determinative of the question thus presented.
During oral argument counsel for objectors stated: "Now, if your Honor will check the objections, you will find that there are very few factsin fact, I don't recall a single finding of fact in there that is disputed. The dispute comes, with the conclusions and the legal findings, to the authority of the Commission to act at all."
Pleadings filed by objectors in this case should be interpreted as an acceptance of the findings of fact by the Commission on all matters before the Commission and particularly on points raised by the objectors  since counsel for objectors so construe it.
Having found that the orders complained of rest within the powers of the Commission, this Court can not substitute its discretion for that of the Commission, where there may be more than one way to accomplish the objective of the Commission, if the one selected is fair and equitable to the security holders and appropriate to effectuate the provisions of Section 11 of the Act.
"If the action rests upon an administrative determinationan exercise of judgment in an area which Congress has entrusted to the agencyof course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so." Securities and Exchange Com. v. Chenery Corp., 318 U.S. 80, loc. cit. 94, 63 S.Ct. 454, 462, 87 L.Ed. 626.[11]
The plan before this Court having met approval from two fact finding bodies, the Public Service Commission of Missouri and the Securities and Exchange Commission, charged by law and especially constituted to pass on matters of such character, we hold that retirement of the 1919 bonds by payment of the principal amount thereof with accrued interest is fair and equitable treatment of the persons affected thereby, and appropriate to effectuate the provisions of Section 11 of the Act; the present security holders will receive under the plan the fair equivalent of the rights surrendered, and the Commission's approval of the plan is not in violation of the provisions of the Act or the legal rights of the bondholders.

Findings of Fact
I. Ogden is a Delaware corporation and is a registered holding company under the Act, 49 Stat. 803, 15 U.S.C.A. § 79a et seq.; Laclede Gas is a Missouri corporation, located and doing business in the City of St. Louis, Missouri. Laclede Gas is a public utility company and a subsidiary company of Ogden within the meaning of the Act.
II. As of December 31, 1943, Laclede Gas had outstanding $8,961,105 principal amount (exclusive of $567.895 retired as a result of a sinking fund payment due March 31, 1944) of Refunding and Extension Mortgage 5% Gold Bonds (herein called the "1904 Bonds") due April 1, 1934, extended to April 1, 1945; $17,500,000 principal amount of First Mortgage Collateral and Refunding 5½% Gold Bonds (herein called the "1919 Bonds") Series C due February 1, 1953 and $5,500,000 principal amount of Series D due February 1, 1960; $2,000,000 principal amount of Collateral Trust 6% Notes, due August 1, 1942 extended to August 1, 1945; 23,330 shares of 5% Cumulative Preferred Stock, par value $100 per share, each share entitled to one vote; and 107,000 shares of common stock, par value $100 per share, each share entitled to one vote. The Indenture securing the 1919 Bonds provides, in Article IV, Section 1 *1012 thereof, that such bonds may be redeemed at the election of Laclede Gas.
III. Laclede Electric is a Missouri corporation engaged in the generation and distribution of electric energy in the City of St. Louis, Missouri. Laclede Electric, which operates certain electric properties leased from Laclede Gas and Granite City Generating Company as well as properties owned by it, is a public utility company and a subsidiary company of Ogden within the meaning of the Act. As of December 31, 1943, Laclede Electric had outstanding a 6% demand note in the principal amount of $705,000, a 5% advance account in the amount of $200,000, and 35,993 shares of common stock without par value.
IV. As of December 31, 1943, Ogden owned all of the outstanding Collateral Trust 6% notes, $200 principal amount of the 1919 Bonds, 5,345 shares of the 5% Preferred Stock, and 90,466 shares of the common stock of Laclede Gas; in addition, Ogden owned the 6% demand note and advance account indebtedness of Laclede Electric, together with 35,727 shares of its stock.
V. On May 20, 1943, after a public hearing on appropriate notice, the Commission entered an order under Section 11 of the Act in the following pertinent respects: (1) Laclede Gas was directed, pursuant to Section 11(b) (2), to "* * * take such steps as may be necessary to recapitalize so as to distribute voting power fairly and equitably" among its security holders; (2) Ogden was directed, pursuant to Section 11(b), to "* * * take such action as may be necessary to divest itself of all of its interest * * * in public utility companies" (including Laclede Gas and Laclede Electric) provided that in the case of Laclede Gas such divestment should not be effected by means of disposition of securities prior to its recapitalization" * * * to the extent necessary to comply with Section 11 (b) (2)"; (3) an overall plan filed by Ogden and subsidiaries which provided, among other matters, as stated in the order, that Laclede Gas was to be recapitalized "* * * in such manner as to comply with the provisions of Section 11(b) (2) of the Act, the recapitalization * * * to include a substantial reduction of its debt. * * *" was approved pursuant to Section 11(e); (4) Ogden and its subsidiaries were directed to proceed "* * * with due diligence to take such steps as may be necessary or appropriate to effectuate this order, including the consummation of plans by Ogden * * * and The Laclede Gas Light Company to effect compliance with the foregoing order." In its Findings and Opinion accompanying the said order of May 20, 1943, the Commission found that a substantial reduction in the debt of Laclede Gas was a necessary step in its recapitalization for the purpose of fairly and equitably distributing voting power among its security holders. No petition for the review of the said order under Section 24 (a) of the Act was filed, and the time within which such a petition might be filed has expired.
VI. After the said order of May 20, 1943, a plan previously filed under Section 11(e) of the Act for the reorganization of Laclede Gas was amended in several important respects, and public hearings thereon were held from time to time after appropriate notice to the security holders of Laclede Gas and Laclede Electric (File No. 54-39). At such public hearings, counsel for holders of part of Laclede Gas 1919 Bonds which are objectors here and counsel for certain holders of Laclede Gas preferred stock participated in the proceedings. On May 24, 1944, the Commission issued its Findings and Opinion on the said plan in which it required that certain amendments be made to such plan in order to secure its approval. The plan, as amended in conformance with the said requirements, was approved by the Commission by order dated May 27, 1944, and is now before this Court pursuant to the provisions of Section 11(e) of the Act.
VII. The plan, as approved by the Commission, provides, among other things, for the sale of the electric properties operated by Laclede Electric to Union Electric Company of Missouri for a base price of $8,600,000 (which purchase has been approved by the Federal Power Commission); payment and discharge, at the principal amount thereof plus interest accrued thereon to the effective date of the plan, but without premium, of the outstanding 1904 Bonds and 1919 Bonds of Laclede Gas; issuance and sale by Laclede Gas of $19,000,000 principal amount of 20-year First Mortgage Bonds and $3,000,000 principal amount of 10-year Serial Debentures; issuance of 14 shares of new common stock, par value $4 per share, for each share of presently outstanding preferred stock; issuance of one share of such new common stock for each share of common stock presently *1013 outstanding; issuance to Ogden of 2,165,296 shares of such new common stock in exchange for its present holdings of Laclede Gas preferred and common stocks and certain other considerations specified in the amended plan; payment by Ogden to the stockholders of Laclede Electric other than itself of a cash amount per share in accordance with a formula specified in the plan, and the subsequent liquidation and dissolution of Laclede Electric; and disposition by Ogden of all of the new common stock of Laclede Gas which it will acquire by virtue of the reorganization of Laclede Gas.
VIII. To comply with the Commission's order of May 20, 1943, Laclede Gas was required to recapitalize including a substantial reduction of its debt, and Ogden was required to divest itself of its interests in Laclede Gas and Laclede Electric. The recapitalization of Laclede Gas including a substantial reduction in its debt was necessary to enable Laclede Gas to comply with the voting power requirements of Section 11(b) (2) and to enable Ogden to place its interests in Laclede Gas in a form that would permit public distribution so as to comply with the integration requirements of Section 11(b) (1).
IX. To comply with the Act, the Commission's order of May 20, 1943, recapitalization of Laclede Gas involving substantial reduction of its indebtedness, and divestment by Ogden of its interests in Laclede Gas and Laclede Electric, it is necessary to sell the electric properties operated by Laclede Electric, and this cannot be done without retirement of the 1919 Bonds. To comply with the Act and the Commission's order of May 20, 1943, it is necessary to retire the 1919 Bonds.
X. Retirement of the 1919 Bonds is involuntary and not at the election of Laclede Gas within the meaning of the mortgage securing the 1919 Bonds. The reduction of Laclede Gas' debt by payment of first mortgage bonds, unless accompanied by retirement of the 1919 Bonds, would confer a windfall on the holders of the 1919 Bonds at the expense of the stockholders.
XI. The Commission in its Findings and Opinion of May 24, 1944, has found that the retirement of the 1919 Bonds by Laclede Gas is attributable to the requirements of Section 11(b) so that the payment of said bonds will be involuntary on the part of Laclede Gas. This finding was supported by substantial evidence before the Commission.
XII. The plan of reorganization of Utilities Power & Light Corporation, predecessor of Ogden, filed under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, in the United States District Court for the Northern District of Illinois, Eastern Division, was approved by such Court in January 1940, and also by the Commission and the requisite security holders and provided that Ogden should submit to the Commission, after the reorganization of such debtor corporation, a plan under Section 11(e) of the Act providing for compliance by Ogden and its subsidiaries with Section 11(b) of the Act. The plan of reorganization of Utilities Power & Light Corporation compelled the filing of the plan under Section 11(e) by Laclede Gas, Laclede Electric, and Ogden.
XIII. The filing of a plan under Section 11(e) of the Act by Laclede Gas, Laclede Electric, and Ogden prior to the issuance of order of the Commission of May 20, 1943, does not, in view of the terms of the Act and orders and findings of the Commission, make the retirement of the 1919 Bonds voluntary and at the election of Laclede Gas within the meaning of the Indenture securing the 1919 Bonds.
XIV. The Commission in its Findings and Opinion of May 24, 1944, found that the payment of the principal amount of the 1919 Bonds of Laclede Gas with accrued interest to effective date of the plan, as provided in the plan, is the fair equivalent of the rights of the 1919 bondholders. This finding was supported by substantial evidence before the Commission.

Conclusions of Law
I. The Court has jurisdiction over Ogden, Laclede Gas and Laclede Electric, over the plan and the subject matter of this proceeding.
II. That this is a proceeding under Section 11(e) of the Act, seeking enforcement of a plan submitted by Laclede Gas, Laclede Electric and the Ogden Corporation; that pursuant to Section 11(e) this Court must determine whether the proposed plan is fair and equitable and whether the Commission in approving said plan is acting within the scope of its statutory authority.
III. The Commission gave reasonable notice and opportunity for hearing to all interested persons with respect to the plan *1014 and reasonable notice and opportunity for hearing was given to all interested persons in the proceedings before this Court.
IV. The Commission's order of May 20, 1943 under Section 11 requiring Laclede Gas to recapitalize and substantially reduce its debt and requiring Ogden to divest itself of its interests in Laclede Gas and Laclede Electric, if within the powers of the Commission under the Act, is not reviewable by this Court because under Section 24(a) of the Act such order is reviewable only in a Circuit Court of Appeals, and only within sixty days of the entry thereof, which period has long since expired. Said order is within the power of the Commission under the Act.
V. When the retirement of an issue of bonds is attributable to Section 11 of the Act, the payment is not voluntary and the bonds may be retired without the payment of voluntary call premiums. Since the retirement of the 1919 Bonds, as provided in the plan, is attributable to the requirements of Section 11 of the Act, the bonds should be retired without the payment of voluntary call premiums.
VI. Since the finding of the Commission that the payment of the 1919 Bonds without premium will not be a voluntary redemption on the part of Laclede Gas was supported by substantial evidence before the Commission, that finding is conclusive in this proceeding.
VII. Since the finding of the Commission that the payment of the 1919 Bonds, as provided in the plan, without premium, is the fair equivalent of the rights of the 1919 bondholders was supported by substantial evidence before the Commission, that finding is conclusive in this proceeding.
VIII. Payment of principal amount plus accrued interest is fair and equitable to the 1919 bondholders, and is the fair equivalent of the rights of the 1919 bondholders. Consequently, if the 1919 bondholders receive under the plan more than such fair equivalent of their claims, i. e., 100, the plan would not be fair and equitable to the stockholders.
IX. The plan now before the Court, including the provision therein for the payment and discharge of the 1919 Bonds without premium, is fair and equitable to the persons affected thereby, including the holders of the 1919 Bonds and the stockholders of Laclede Gas and of Laclede Electric and is appropriate to effectuate the provisions of Section 11 of the Act, within the meaning of Section 11(e) thereof.
X. To the extent necessary to enforce and carry out the terms and provisions of the plan, it is appropriate for this Court to take exclusive jurisdiction and possession of Laclede Gas and Laclede Electric and their assets wherever located; and by order, this Court will direct that such terms and provisions of the plan be consummated, and that Ogden, Laclede Gas, Laclede Electric, St. Louis Union Trust Company, Trustee under the Mortgage securing the 1919 Bonds, and Bankers Trust Company and Mississippi Valley Trust Company, Trustees under the Mortgage securing the 1904 Bonds, and their respective officers, directors, and agents take such steps and perform such acts as may be necessary for the purpose of carrying out said terms and provisions of the plan.
XI. The plan having been approved by the Commission and by this Court in accordance with Section 11(e) of the Act, by order to be entered, all persons will be enjoined from doing any act or taking any action interfering with, or tending to interfere with these proceedings, with the enforcement of said order of the Commission or with the carrying out of the plan, including the commencement or prosecution of any action, suit or proceeding at law or in equity or under any statute in any court, before any executive or administrative officer, commission or tribunal, other than such proceedings before the Commission or this Court or the Circuit Court of Appeals as may be appropriate under the Act or the rules and regulations promulgated thereunder.
Order in conformity with this opinion, findings of fact and conclusions of law will be submitted.
NOTES
[1] Hereinafter referred to as "Commission".
[2] Public Utility Holding Company Act 1935, 15 U.S.C.A. § 79 et seq., hereinafter referred to as the "Act"; Laclede Gas Light Company referred to as "Laclede Gas"; Laclede Power & Light Company referred to as "Laclede Electric"; and Ogden Corporation referred to as "Ogden".
[3] 15 U.S.C.A. § 79a.
[4] All underscoring in quotation of Act by the Court.
[5] 15 U.S.C.A. § 79k (e). 15 U.S.C.A. § 79z (c).
[6] 15 U.S.C.A. § 79r.
[7] City Nat. Bank & Trust Co. v. Securities and Exchange Commission, 7 Cir., 134 F.2d 65, loc. cit. 68.
[8] City Nat. Bank et al. v. Securities and Exchange Commission, 7 Cir., 134 F.2d 65; New York Trust Co. v. Securities and Exchange Commission, 2 Cir., 131 F.2d 274, 275.
[9] See Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626.
[10] In re Securities and Exchange Commission, 3 Cir., 142 F.2d 411, 420.
[11] See also Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A. L.R. 1217; and American Power & Light Co. v. Securities and Exchange Commission, 1 Cir., 141 F.2d 606.